## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **DEBORAH A. GAUDET AND RAY GAUDET, individually and on behalf of a Class of All Other Similarly Situated Persons**<br><br>**v.**<br><br>**HOWARD L. NATIONS, APC; THE NICKS LAW FIRM, LLC; RUEB & MOTTA, APLC, JOSEPH A. MOTTA, ATTORNEY AT LAW, APLC; and THE RUEB LAW FIRM, APLC** | **CIVIL ACTION**<br><br>**NO. 19-cv-10356**<br><br>**JUDGE WENDY B. VITTER**<br><br>**MAGISTRATE JANIS VAN MEERVELD** |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT, BENJAMIN A. COOPER, ESQ. AND STRIKE HIS EXPERT REPORT

**NOW INTO COURT**, through undersigned counsel, come Howard, L. Nations, APC, The Nicks Law Firm, LLC, Rueb & Motta, APLC, Joseph A. Motta, The Rueb Law Firm, APLC, Howard L. Nations, Cindy L. Nations, Shantrell Nicks, Gregory D. Rueb, and Joseph A. Motta, Attorney at Law, APLC ("Defendants") who move this Court for an order (1) excluding the legal opinion testimony of plaintiffs' expert, Benjamin A. Cooper, Esq. ("Cooper"), and (2) barring the Plaintiffs from presenting any witness testimony that provides a legal opinion or conclusion. Testimony of this nature—which states a legal opinion or conclusion—is inadmissible. Furthermore, it improperly usurps both the Court's role in advising the jury of the law and the jury's role in applying that law, and serves to foster undue jury confusion as to the legal standards applicable to the case and the means by which they are to be applied.

1

## I.      BACKGROUND FACTS

### Timeline Of Events Relating To Subsistence Claimants[1]

Together, the law firm defendants in this matter prosecuted BP subsistence claims on behalf of persons whose abilities to hunt, fish and subsist were impaired by the BP explosion and its aftermath.  Notably, involvement in BP claims of Howard L. Nations, APC, ("The Nations firm"), together with Rueb & Motta, PLC, Joseph A. Motta and Greg Rueb (collectively "Rueb"), as well as the involvement of Shantrelle Nicks and the Nicks Law Firm (collectively "Nicks") began before those subsistence claims were filed.  The Nations law firm and Rueb jointly prosecuted many medical claims under the BP settlement agreement before Mr. Nations and Mr. Rueb ever became involved in representing subsistence claimants. Independently, Nicks, for her part, was handling BP medical and subsistence claims in Mississippi before she met Mr. Nations and Mr. Rueb.

By April 2015, Mr. Nations and Mr. Rueb had learned that Ms. Nicks was handling BP medical claims, and they wanted to discuss with Ms. Nicks the possibility that the three might be able to work together on the medical claims. Mr. James L. Griggs is an outside consultant who was working with Mr. Nations and Mr. Rueb on BP medical claims. In April 2015 Mr. Griggs and Mr. Nations travelled to Gulfport, MS to meet with Shantrelle Nicks.  Their meeting in Gulfport in April 2015 was designed to revolve around the handling of medical claims. While together, however, Nicks, Griggs, and Nations not only discussed BP medical claims but also discussed BP subsistence claims.  During the meeting, Nations and Griggs learned that Nicks had

---

[1]  See Declaration of Howard L. Nations, APC's 30(b)(6) representative Amber Affolder verifying the accuracy of these facts attached as Exhibit "1."

a docket of BP subsistence claims and expertise in handling them.  Nations, Griggs and Nicks discussed cooperating jointly to handle such BP subsistence claims.

Part of the reason for the interest of Nations and Rueb was the fact that they believed that some of their joint medical clients might be eligible for BP subsistence claims.  The three decided to hold a further meeting to discuss BP subsistence claims. That meeting was held in Houston, TX on approximately April 16, 2015.  On that date, Nations, Rueb and Nicks orally agreed to work together to file and handle BP subsistence claims.

Nations, Rueb and Nicks decided not to advertise but simply to send correspondence to Nations' and Rueb's BP medical clients informing them of the potential opportunity to make and recover under provisions of the BP/Deepwater Horizon Settlement Agreement relating to subsistence claims.

Correspondence to BP medical claimants of Nations and Rueb was prepared.  The correspondence informed the medical claimants of the potential for filing subsistence claims under the Deepwater Horizon/BP Settlement Agreement.  Nations and Rueb already had experience in establishing local field offices in communities where potential BP claimants resided.  They had established field offices for BP medical claims. The group established several field offices to facilitate communication with persons responding to the letter being sent to existing Nations and Rueb medical clients.

The field offices included telephones and scanning machines so that documents brought by potential claimants to the locations would be scanned to the groups' law firms and so that potential subsistence claimants could call the groups' law firms.  Workers were selected to greet

subsistence claimants and coordinate receipt of requisite documentation for subsistence claims. A main instruction given to the field workers was to forward all claimants' substantive legal questions to one of the group's law firms. Staff at the offices of those law firms would gather the questions and direct the questions to attorneys of the group's firms for a response. Field workers were also instructed to make sure that, to the extent documents were completed, they were fully completed. Intake forms and packages of the requisite documents were distributed to claimants who appeared at the field offices. Completed intake forms were scanned to attorneys at the groups' law offices.

In addition to the availability to potential subsistence claimants of telephone contact with attorneys at the group's law offices, Mr. Rueb made himself personally available at the field offices and travelled among the offices in person to make sure that the process of obtaining information sufficient to file the subsistence claims was proceeding on track. Ms. Nicks also performed this function particularly for the group's Gulfport and Mobile offices.

The group's original intention was for Ms. Nicks to file and process the BP subsistence claims. Nations and Rueb were originally planning to communicate with their existing client base, and deal with client relations, infrastructure, and funding.

Medical clients abundantly responded to the letter about possible subsistence recovery. They also brought their friends and family to the field offices. Therefore, based on the volume of claims and claimants, Nations and Rueb became more involved to assist Ms. Nicks in the process of preparing claims for filing and, as to Nations, the actual filing of claims.

4

The BP/Deepwater Horizon Settlement Agreement permitted the subsistence claims to be filed electronically, by fax, by FEDEX and by hand delivery to the BP Deepwater Horizon Claims Center ("DHECC").  At first, the group filed claims electronically. Ms. Nicks and later, Westpark, a company located in Houston, TX, were electronically filing subsistence claims. With the sizable response to the medical letters, a great number of claims were being electronically filed.

The subsistence claim form issued by the DHECC was a Teal color and became known as a "Teal" form.  The key to the filings was the "Teal" form. Once a Teal form was timely filed, additional documents like hunting or fishing licenses could be added on a supplemental basis after the filing deadline which was June 8, 2015.

The DHECC electronic filing portal was not up to the job of accommodating such a large number of subsistence claims. Filing on the DHECC portal was either as slow as a snail or for some time periods, completely impossible. The portal would crash, causing the filer to lose data and be forced to restart the filing process.[2]  Huge, persistent problems with the DHECC portal were evident.[3]  To ensure that the Teal forms of all the group's subsistence clients were properly and timely filed, on approximately June 3, 2015, a decision was made by the group to completely abandon electronic filing and to manually file all subsistence claims.  After this decision, all claim forms were manually filed.

---

[2] Well after the June 8, 2015 deadline, the group realized that portal problems went beyond delay and unreliability.  Teal forms properly entered into the portal had completely disappeared.

[3] See the Affidavit of Jim Griggs with Exhibits attached as Exhibit "2."

The deadline for filing claims was June 8, 2015, and a great number of people continued to hire the group to file their subsistence claims. Initially, only Ms. Nicks and Westpark were filing subsistence claims. To accommodate the filing of all the Teal forms, in late May 2015, the Nations firm began manually filing subsistence claims as well.  Shantrelle Nicks and Westpark continued filing subsistence claims.

The Nations firm tracked all of its manual filings and created a table listing inventory of all subsistence claims filed, the date filed, etc. All claims allocated to Nations for filing were timely filed.  Nicks actually packed a U-Haul with Teal forms and physically delivered them to the DHECC office on a timely basis. ALL subsistence claims entrusted to the group were timely filed.

The only dispute about timeliness came when the group's field worker Judy Lukkar reported on June 8, 2015, that even though she presented herself to file claims at the DHECC office on June 8, 2015 before midnight, DHECC's office supervisor closed the doors on her, locked the doors, and refused to let her in to file the claim forms that she was attempting to tender to DHECC. Judy protested to the office supervisor stating that she had made it before midnight.  Three other of the group's field workers (Margaret Castillo, Christie Boudreaux, and Melisa Duet) witnessed the fact that Judy had made it to the office on time.  They were in the parking lot of the office when Judy took the completed claim forms to the door of the office.

On June 11, 2015, Howard Nations appealed DHECC's decision to prematurely close the office on Judy and to reject her timely tender of claim forms.[4] The appeal included Affidavits of

---

[4] See Affidavit of Howard Nations with exhibits attached as Exhibit "3."

6

Judy Lukkar, Margaret Castillo, Christie Boudreaux, and Melisa Duet, each of whom confirmed that the claim forms were at the DHECC office before midnight on June 8, 2015. The appeal went to the Settlement Administrator for subsistence claims Christine Hendrick.

DHECC informed the group that the Lukkar boxes of claims would be accepted at DHECC's Metairie office pending resolution of the group's objections to DHECC's rejection of the boxes. The claims first tendered by Lukkar to the DHECC just before midnight on June 8, 2015 were delivered to the DHECC Metairie office. Ultimately, however, DHECC rejected the group's appeal that those filings were timely. Thus, although DHECC wrongly refused to accept the claims timely tendered by Judy Lukkar, the group continues to contend that all claims within the Lukkar boxes were timely tendered to DHECC. Accordingly, the group either timely filed or, with respect to the Lukkar claims, timely tendered, all Teal forms to DHECC on or before June 8, 2015.

The group's large number of electronic filings had already caused the inadequate DHECC portal to crash. Now the group's manual filings meant a great deal of work for DHECC.

DHECC had to enter into the portal manually filed claims. When DHECC entered timely manual claims into the portal, DHECC did not uniformly attribute the June 8, 2015 delivery date to claim documents, even though they were timely tendered to DHECC either physically or by Federal Express. In many instances, DHECC marked documents with the date that it was inputting data, a date after June 8, 2015, instead of the timely delivery date of June 8, 2015. When DHECC utilized a data input date, instead of a timely manual delivery date, the

appearance of tardiness was attributed to claims that were actually delivered on a timely basis, either physically or by Federal Express. The group individually examined each claim and strenuously objected on a repeated basis each time that DHECC utilized a wrong data input date to make a timely filed Teal form appear tardy.

The group not only found that DHECC was incorrectly dating manually filed documents, other similar problems ensued.  For instance, in September 2015, overnight, 3,222 new claims appeared on the group's BP subsistence portal.  These appearing 3,222 new claims were not entered by the group, DHECC turned off the new claim filing function for the group after the June 8, 2015 filing deadline.  These 3,222 new appearing claims were entered by or on behalf of DHECC.  Many of the appearing claims were incorrect with wrong social security numbers, claim numbers, duplications etc.

DHECC's errors in data entry of manually filed claims, especially its errors in the suddenly appearing 3,222 new claim files, created a large logistical problem for the group.  The group met in September 2015 to address the problems and make sure the group's subsistence claims were properly handled.

Timely delivered Teal forms could be supplemented with supportive documents such as fishing licenses and driver's licenses after the June 8, 2015 deadline. However, supportive documents like driver's licenses, hunting licenses, fishing licenses, and tax forms could not be entered after June 8, 2015 *unless a timely Teal form had timely been filed on or before June 8, 2015*. In instances where only a Teal form was filed by June 8, 2015, the group worked on each individual claim.  After June 8, 2015, the group continued to provide BP with information not

present with the initial Teal form filings. After timely filing its claims, the group individually processed and followed up on each claim.[5]  Initially, Nicks was the only person actually filing supplemental documents within the portal.   However, the Nations firm was gathering information, organizing it, and scanning it to Ms. Nicks for entry into the portal.

The group sent letters and made calls to claimants requesting supplemental information. Whenever supplemental information was made available by their clients, that information was downloaded by the group into the DHECC portal whether or not a request for more information, known as an "insufficiency notice" had been received from DHECC.   Stated otherwise, the group did not wait for an insufficiency notice to supplement the timely filed Teal forms.  When insufficiency notices were received, the group would on an individual basis, either furnish the supplemental information if the clients had provided it, or request an extension of time to respond to the insufficiency notice, if the clients had not provided the information.

Initially, Ms. Nicks filed virtually all supplemental materials with Nations scanning and organizing documents for filing. Attorneys with the group also continued to communicate in person and over the phone with subsistence clients. Field offices remained open after the June 8, 2015 filing deadline to receive supplemental items from subsistence claimants.   Additionally, calls were taken from the field offices by attorneys with the group. Documentation brought by

---

[5] Supportive documents like fishing and driver's licenses could not be filed in the portal unless a Teal form had been timely filed. The presence of supportive documents in the portal for a particular claimant is proof that the Teal form for that client was timely filed or deemed by BP to be timely filed.

claimants to the field offices was scanned to the group's law offices and filed in the DHECC portal.

In order to complete a subsistence claim certain hunting and fishing licenses needed to be provided to DHECC. It soon became evident that the Louisiana Department of Wildlife could not cope with the demand of license requests to complete all subsistence claims. There was a huge delay in the Louisiana Department of Wildlife's response to the group's requests for hunting and fishing licenses. Licenses could not be produced by the Louisiana Department of Wildlife and Fisheries in time to meet deadlines of the DHECC Settlement Administrator. Howard Nations engaged in extensive negotiations with the Subsistence Settlement Administrator Christine Hendrick and the Louisiana Department of Wildlife and Fisheries.[6] Ultimately, Howard Nations was able to reach agreement between the group, the Louisiana Department of Wildlife and Fisheries and the DHECC Subsistence Settlement Administrator. The Agreement gave the DHECC Settlement Administrator direct access to the entire Louisiana Department of Wildlife and Fisheries database. The database was available to the DHECC in January 2016. With that database access came the promise of the DHECC Settlement Administrator that each claim denied for licensing purposes would be re-reviewed and, if necessary licenses were present in the database, the claim would be reopened and, if appropriate on other criteria, paid. *Id.*

After the Louisiana Department of Wildlife and Fisheries' database was made available to the DHECC Settlement Administrator in January 2016, the Louisiana Department of Wildlife

---

[6]  See Affidavit of Mr. Nations attached as Exhibit "3."

and Fisheries returned boxes and boxes of licensing requests that had been submitted on behalf of individual subsistence claimants by the group to the Louisiana Department of Wildlife and Fisheries.

To be clear, the Louisiana Department of Wildlife and Fisheries did not agree to give the group access to the Louisiana Department of Wildlife and Fisheries database. Rather, direct access was given only to the DHECC Settlement Administrator so that the DHECC Settlement Administrator could directly search for licenses relating to all subsistence claimants.

During the period after June 8, the group continued to give instructions to field office workers indicating that they were to forward all substantive questions to the group's law offices. In December 2015, Nations Chief Operating Officer Amber Affolder acted to refresh the training originally provided to field workers.  While the field workers were vital to the subsistence claim process, the group insisted that substantive legal questions be referred to the group's law firms and that such questions not be answered by non-attorney field workers.  In December 2015, all field workers were summoned to New Orleans for a supplemental training class in order to emphasize this and other instructions.

For Christmas 2015 some of the group gathered in Houston to celebrate Christmas. The day after the Christmas party, the group met for a substantive meeting.  In early 2016, the group decided to move operations to Houston under the primary purview of the Nations firm.  Once the Nations firm located office space in Houston, headquarters for the group's subsistence activities moved to Houston, TX.  Approximately 80 employees worked at the Houston office in a 13,000 square foot office space.  The Nations firm created a computer program and database to process

11

subsistence claims in this Houston office.  The database also permitted the assignment of tasks. Each worker would turn on their computer to an organized listing of items to be accomplished or calls to be returned.

The group continued to work to recover the maximum available award for each of its subsistence claimants.  However, certain "polices" of DHECC prevented recovery in some instances.  For instance, the DHECC Settlement Administrator promulgated a policy stating "the Settlement Program requires claimants to submit licensing applicable to all claimed species for the period preceding claimed losses and in effect at the beginning of their losses."[7]  The DHECC Settlement Administrator's application of this policy was fatal to many claims.  In the event a claimant possessed several requisite licenses for items contained on their Teal forms and was lacking a single license for a single item on the Teal form, DHECC applied this policy to deny all recovery for all species.  This meant that some claimants that did have a license for several items listed on their Teal form recovered nothing because they listed one species item for which licensure was missing.  Even though the group appealed and fought this application, the DHECC Settlement Administrator would not reverse position on it.  Therefore, the group took the initiative to begin amending Teal forms to remove the particular species item for which licensure was absent. Still DHECC continued to deny recovery in many instances.

DHECC performed "field visits" on each claimant whose claim exceeded $10,000.  The group either had a group attorney present at field visits or had a field worker present with an

---

[7] See DHECC policy produced by DHECC pursuant to subpoena duces tecum served in this matter attached as Exhibit "4."

attorney of the group on the phone.  Field visits were difficult to pass.  A field visit could be failed on many different grounds.  Failing a field visit meant that despite appeal efforts, it was almost certain that a claim would be denied.

Unbeknownst to the group, some subsistence clients had received other recoveries from DHECC and executed a release agreement precluding any further  recoveries. If a claimant had executed such a release his subsistence claim would be denied.  Also some subsistence clients had received earlier recoveries from DHECC that precluded any recovery more than 180 days after their initial DHECC recovery. Subsistence claims of such claimants were rejected by DHECC even though filed by the June 8, 2015 deadline. Recovery was denied by DHECC in some instances because of claim numbers DHECC considered to be exorbitant or fraudulent.

There were multiple individualized reasons that DHECC selected to deny claims.  The group fought those denials, with success in many instances.  The group asked for re-reviews, amended claim forms and attempted to recover on the claims until it became evident that no further recoveries were conceivably possible.  Basically, this was at the end of the BP subsistence process.  At that point, the group began working to notify all claimants for whom recovery was not accomplished.  A notification letter was drafted.  A final version of this letter appears in the plaintiffs' complaint Doc. 1 at pg. 17 of 27.

After the letter to non-recovering claimants was drafted, the group outsourced the Xeroxing, stamping and envelope stuffing of the letter to James Griggs of LitServ.  As LitServ began to mail the letters, calls and responses to the letters increased to the point that callers were experiencing delays and busy signals.  Mailing of the already stuffed envelopes was temporarily

stopped so that the group could catch up with phone calls.  Once existing calls were answered,

the remaining stuffed envelopes were mailed and further responsive calls from non-recovering

claimants were answered.

### Result of Representation Of Subsistence Claimants

The average recovery of subsistence claimants who were not represented by the group,

according to figures produced by the DHECC Subsistence Settlement Administrator, was

$11,110.34.   The average recovery of subsistence claimants represented by the group was

$17,083.56.

In this litigation, the 30(b)(6) representative of The Nations Law Firm testified on

February 12, 2020.[8]  Plaintiffs' proposed legal expert Mr. Cooper indicates in his report that he

read the 30(b)(6) deposition but nowhere mentions in his report the facts to which Ms. Affolder

testified.  He does not mention the access which subsistence claimants had to the group's lawyers

at field offices or at DHECC field visits.  He does not acknowledge that instructions were given

to field office workers to refer substantive legal questions to the group's lawyers. He does not

say that the group has proof of timely filing of virtually all Teal forms or that there was a dispute

over timely filing, but only for the Judy Lukkar segment of Teal forms.  Cooper does not even

refer to the fact that the group obtained direct access for DHECC to the Louisiana Department of

Wildlife and Fisheries database or that the group called and wrote subsistence claimants,

supplementing the claimants' Teal forms even before DHECC issued insufficiency notices.

Strangely, Cooper does not state that the group filed extensions of time within which to respond

---

[8]  See 30(b)(6) transcript of the 30(b)(6) representative Amber Affolder which appears in
the record as Record Document 193-7 filed on March 3, 2020.

to DHECC insufficiency notices or filed numerous appeals.  Cooper does not even say there is a factual dispute regarding these issues.

Yet even more serious issues relating to what Cooper does say in his report are fatal to its admissibility and are the focus of this Motion.

## II.    ARGUMENT

Cooper's Affidavit far exceeds the permissible bounds of expert testimony by offering numerous opinions of the law, as well as how and why, in his view, the evidence establishes certain legal elements required to prove malpractice, a decision reserved to the trier of fact.[9] As will be shown below, Cooper's opinion is not limited to factual explanations of malpractice law, standard of care, or procedures which might assist the jury in their determinations of the ultimate issues, but goes further to express his "expert" opinions as to what the law is, and what the evidence establishes, including various findings on ultimate issues reserved to the jury, specifically on the element of causation. Even a cursory review of this Affidavit shows that it is thinly disguised argument of counsel. Accordingly, Defendants respectfully request that the Court exclude Benjamin A. Cooper. Esq.'s Affidavit as impermissible legal briefing.

The Plaintiffs filed Cooper's "Affidavit," a 30-page legal brief under the guise of an expert opinion, as supporting evidence for their Supplemental Memorandum in Support of Class Certification, (Doc. 189-2).[10] The Affidavit takes aim squarely at the ultimate issues to be

---

[9] Cooper, also repeatedly expressed opinions as to what the evidence established, although those assertions are very much in dispute, and then proceeded to reach conclusions, based on his determination of the facts, on numerous issues which are reserved for the trier of fact.

[10] The Affidavit of Benjamin A. Cooper, Esq. is attached hereto as Exhibit "5".

decided by the fact finder in this case – whether or not Defendants breached their duties to Plaintiffs – and delivers a veritable treatise on Mississippi court rulings and opinions and on the Mississippi Model Rules of Professional Conduct. The Affidavit states that it is Cooper's opinion on "Plaintiffs' claims, including an explanation of applicable Mississippi law as it applies to the facts."[11] Such testimony is an impermissible legal opinion and should be excluded.

Cooper's testimony is an impermissible legal opinion and should be excluded because Mississippi law does not govern any of the tort claims brought against Defendants.  The agreement between Defendants and the other named defendants is alleged to be a "joint venture contract" by plaintiffs yet the agreement at issue does not contain any choice of law provision at all.[12]  Even if it did, which it does not, the law allegedly selected by the parties to govern their contractual relationship would not automatically control the law governing tort claims brought by third parties.[13]  Rather, a conflict of laws analysis must be performed.

This court will apply the choice of law rules of Louisiana, as the forum state, when conducting a conflict of laws analysis.[14]  Under Louisiana law:

---

[11] *See* Exhibit "5", pg. 1, ¶ 2.

[12] *See* Doc. 236, pp. 26-27.

[13] Plaintiffs may urge that the "Mississippi choice of law provision" contained in the attorney-client contracts govern the tort claims.  This argument fails.  Under Louisiana law, a choice of law provision will generally govern "all other issues of conventional obligations."  La. Civ. Code art. 3540.  However, "the state's law specific by the choice-of-law clause is applied only to those claims pertaining to the instrument.  All other claims are governed by the forum state's law."  *Smith v. EMC Corp.,* 39 F.3d 590, 597 (5th Cir. 2004).  As such, the choice of law provision in the attorney-client contracts has no bearing whatsoever on the substantive law applied to Plaintiffs' tort claims.  Louisiana law would govern the alleged tort claims.

[14] *NOLA Ventures, LLC v. Upshaw Ins. Agency, Inc.*, 932 F.Supp. 2d 743, 752 (E.D. La. 2013).

...an issue of delictual duties or quasi-delictual obligations is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.

That state is determined by evaluating the strength and pertinence of the relevant policies of the involved states in the light of: (1) the pertinent contacts of each state to the parties and the events giving rise to the dispute, including the pace of conduct and injury, the domicile, habitual residence, or place of business of the parties, and the state in which the relationship, if any, between the parties was centered; and (2) the polices referred to in Article 3515, as well as the policies of deterring wrongful conduct and of repairing the consequences of injurious acts.[15]

More specifically:

Issues pertaining to standards of conduct and safety are governed by the law of the state in which the conduct that caused the injury occurred, if the injury occurred in that state or in another state whose law did not provide for a higher standard of conduct.

In all other cases, those issues are governed by the law of the state in which the injury occurred, provided that the person whose conduct caused the injury should have foreseen its occurrence in that state.

The preceding paragraph does not apply to cases in which the conduct that caused the injury occurred in this state and was caused by a person who was domiciled in, or had another significant connection with, this state.  These cases are governed by the law of this state.[16]

The named Plaintiffs are allegedly domiciled in Louisiana and were purportedly injured when misrepresentations were made to them in Louisiana.[17]   Mississippi has no significant

---

[15] La. Civ. Code art. 3542.

[16] La. Civ. Code art. 3543.

[17] *See* Doc. 236, pp. 3-8., para. 2, 22, 33.

17

relationship whatsoever to the fraud allegations.  None of the named Plaintiffs are domiciled there; none of them allege that any misrepresentations were made to them there; and none of them allege that they were injured there.  The substantive law of Louisiana, therefore, will govern Plaintiffs' tort claims.  Therefore, in addition to Federal Rules of Evidence 701, 702 and 403, Cooper's should be excluded, frankly, because he applies the wrong state's laws to the facts of this case.

### III.   LEGAL STANDARD

The Supreme Court has charged trial judges with the responsibility of acting as gatekeepers to ensure that expert testimony is relevant, does not usurp the role of the judge or the jury, and is based on a proper factual and methodological foundation.[18]  The Court has explained that "this basic gatekeeping obligation" applies not only to "scientific" testimony, but "to all expert testimony."[19]  Cooper's testimony should be excluded based on the non-exclusive criteria set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* and Federal Rules of Evidence 701, 702 and 403.

*Daubert* instructs the trial court to evaluate in determining the admissibility of an expert's opinions and testimony.  Under *Daubert*, the trial court is to examine: (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; the known or potential rate of error of a technique or theory when applied; (4) the

---

[18] *Daubert v. Merrell Dow Pharmas, Inc*., 509 U.S. 579 (1993).

[19] *Kumho Tire Co., Ltd. v. Carmichae*l 526 U.S. 137, 147 (1999).

existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community.[20]

The United States Supreme Court in *Kumho Tire Company Limited v. Carmichael*, 526 U.S. 137 (1999) made it clear that not only scientific but also "experience-based testimony" like that of Plaintiffs' proposed expert witness in this case, must pass the same *Daubert* analysis to be admitted at trial.[21]  The expert's testimony must be reliable at each and every step or else it is inadmissible.  The reliability analysis applies to all aspects of an expert's testimony:  The methodology, the facts underlying the expert's opinion, [and] link between the facts and the conclusion.[22]

The Federal Rules of Evidence allow an expert witness qualified "by knowledge, skill, experience, training, or education" to provide opinion testimony if such testimony will "assist the trier of fact to understand the evidence or determine a fact in issue."[23]  However, opinion testimony that states a legal conclusion or opinion is not admissible.[24] The committee notes to

---

[20] *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 275 (5th Cir. 1998) citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993).

[21] *Black v. Food Lion, Inc.*, 171 F.3d 308, 311 (5th Cir. 1999) (quoting *Kumho Tire*, 119 S.Ct. at 1176).

[22] *Norwood v. Raytheon Company*, 2008 WL 677474 at *11 (W.D. Tex. 2009) citing *Knight v. Kirby Inland Marine Inc.,* 482 F.3d 347, 355 (5th Cir. 2007).

[23] Fed. R. Evid. 702.

[24] *See Goodman v. Harris Cnty*., 571 F.3d 388, 399 (5th Cir. 2009) ("An expert may never render conclusions of law."); *see also Nationwide Transp. Fin. v. Cass Info Sys.*, 523 F.3d 1051, 1058–60 (9th Cir. 2008) (excluding testimony relating to the application of the UCC and agency law to the facts of the case and that labeled the parties actions as either "wrongful" or "intentional"); *United States v. Caputo*, 517 F.3d 935, 942 (7th Cir. 2008) (stating that "the only legal expert in a

Rule 704 make explicit that Rules 701, 702, and 403 "stand ready to exclude opinions phrased in terms of inadequately explored legal criteria."[25] Furthermore, allowing the admission of such opinion testimony would wrongfully impinge on the Court's and the jury's exclusive role in determining the law and applying that law to the facts of the present case.[26] Courts generally assess whether or not opinion testimony illegitimately embraces a legal conclusion by determining whether the terms used by the witness have a "separate, distinct and specialized meaning in the law."[27]

Opinion testimony of this sort is inadmissible regardless of whether it is offered as expert opinion testimony under Federal Rule of Evidence 702 or lay opinion testimony under Federal Rule of Evidence 701.[28] In the former context, expert testimony that merely provides a legal opinion or conclusion cannot satisfy the explicit prerequisites for admission under Rule 702

---

federal courtroom is the judge."); *McCabe v. Crawford & Co.*, 272 F. Supp. 2d 736, 739 (N.D. Ill. 2003) (stating that "[t]he Federal Rules of Evidence prohibit experts from offering opinions or legal conclusions on issues that will determine the outcome of the case.").

[25] Fed. R. Evid. 704, Advisory Committee Notes.

[26] *See, e.g., Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997) ("There being only one applicable legal rule for each dispute or issue, it requires only one spokesman of the law, who of course is the judge.") (citation and quotation marks omitted); *Nationwide Transp. Fin*., 523 F.3d at 1058 ("instructing the jury as to the applicable law is the distinct and exclusive province of the court"); *Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988) (noting that testimony embracing a legal conclusion or opinion would constitute an "inadmissible . . . invasion of the province of the judge" and that "testimony which articulates and applies the relevant law . . . circumvents the jury's decision-making function by telling it how to decide the case") (internal quotations omitted); *Torres v. County of Oakland*, 758 F.2d 147, 149–50 (6th Cir. 1985) (excluding testimony concerning whether someone was "discriminated against" as providing an impermissible legal conclusion and noting that "[t]he problem with testimony containing a legal conclusion is conveying the witness' unexpressed, and perhaps erroneous, legal standards to the jury").

[27] *Torres*, 758 F.2d at 151.

[28] *See Nationwide Transp. Fin.*, 523 F.3d at 1058–60.

because such testimony cannot assist the trier of fact.[29]  Likewise, in the latter context, lay opinion testimony offering a legal opinion or conclusion is inadmissible simply because it cannot possibly be considered helpful to the jury, as is explicitly required by Rule 701(b).[30]  Under both Rules 701 and 702, exclusion of opinion testimony is left to the court's sound discretion.[31]

Cooper's affidavit is an ill-disguised legal brief merely reciting legal arguments that Plaintiffs' counsel has made and will likely continue to make.[32]  It speaks to the ultimate legal issues to be determined by the trier of fact – whether Defendants breached their duties to Plaintiffs – and offers testimony replete with Cooper's own opinions of the law, characterizations and legal conclusions of what certain evidence establishes, and arguments of counsel disguised as expert testimony.[33]  Cooper's affidavit and the opinions offered therein cannot be tested, peer reviewed, and are subject to no know external standard or controls.  Further, Cooper has offered no support that his opinions are generally accepted in the legal community.  This type of testimony is not allowed under the Federal Rules of Evidence or this Circuit's precedent.[34]

---

[29] *See* Fed. R. Evid. 702; *Specht*, 853 F.2d at 807.

[30] Fed. R. Evid. 701(b) (requiring that lay opinion testimony must be "helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."); *Nationwide Transp. Fin.*, 523 F.3d at 1059 (noting that lay legal opinion testimony is not helpful to a clear understanding of the testimony or a fact in issue).

[31] *See Nationwide Transp. Fin.*, 523 F.3d at 1057–58.

[32] The affidavit contains 33 footnotes with legal citations to more than a dozen Mississippi state court cases and numerous other legal treatises and scholarly works.

[33] *See generally, e.g.,* Exhibit 5, ¶¶ 2, 7, 23, 30, 33, 34, 36, 37, 38, 40, 42, 43, 45, 46, 47, 51, 52, 53, 54, etc.

[34] *See Goodman*, 571 F.3d 388; *Askanase*, 130 F.3d at 673(affirming district court's decision to exclude, as impermissible legal opinion, expert's proposed testimony that defendants breached their fiduciary duties); *see also Master-Halco Inc. v. Scillia, Dowling & Natarelli, LLC*, 2010 U.S.

One of the ultimate legal issues reserved to be determined by the trier of fact is causation and Cooper improperly provides an opinion regarding the element of causation.  Cooper attempts to provide a legal opinion in regard to the issue of whether Defendants' alleged negligence was the proximate cause of the injuries alleged to have been sustained by Plaintiffs, but fails to provide any information regarding the methodology used to formulate his opinion.

Proximate cause is an essential element in an action for negligence that there be some reasonable connection between the act or omission of the defendant and the damage which plaintiff has suffered.[35]  In order for an act of negligence to proximately cause the plaintiff's damage, the fact finder must find that negligence was both the cause in fact and legal cause of the damage.[36]  To be held liable, a defendant's negligence need not be the sole cause of an injury, but the defendant's negligence must be a substantial factor in producing the injury.  Legal

---

Dist. LEXIS 38113, at *11-12 (D. Conn. Apr. 19, 2010) (stating that "Expert testimony is permitted to help the jury understand facts that are beyond the understanding of lay people.  *See* Fed.  R. Evid. 702.  But in providing this service, even paid experts are not to become proxies for their clients. *See United States v. Grinage*, 390 F.3d 746, 750 (2d Cir. 2004) (explaining that jurors were not "helped" within the meaning of Rule 701 by opinion testimony that, in addition to telling them  "what was in the evidence," also told them "what inferences to draw from it").As Judge Learned Hand wisely put it, "Argument is argument whether in the [witness] box or at the bar, and its proper place is the last.").

[35] *Teague v. St. Paul Fire & Marine Ins. Co.,* 974 So.2d 1266 (La. 2/1/2008); *Brunswick Seafood, Inc. v. Williams Law Grp., LLC,* 2019 La. App. Unpub. LEXIS 2 (La. App. 1st Cir. 1/8/2019).

[36] *Leonard v. Reeves,* 82 So.3d 1250 (La. App. 1st. Cir. 1/12/2012).

or proximate cause, or scope of duty, normally does not present a significant or serious problem in a legal malpractice case.[37]

Under Rule 702 of the Federal Rules of Evidence, even a qualified expert need not be permitted to testify if, in the district court's broad discretion, the testimony would not assist the jury.[38]  An example is the circumstance in which testimony would provide information that is a matter of common knowledge or that is easily understood by jurors and can be adequately addressed through cross-examination.[39]

Cooper opines that the Defendants breached their fiduciary duties to Plaintiffs.  Cooper opines that the breaches can be organized into three categories: (1) those claims that were never filed allegedly (including Plaintiffs Gaudet, Butler, Campbell, Hebert, and Scales)[40]; (2) those claims that were allegedly filed late (including Plaintiffs Collins and Ledet)[41]; and (3) those claims that were allegedly filed without sufficient documentation (including Plaintiffs Falgoust, Gamberella, and Moore)[42].

Cooper states as a direct result of Defendants' breaches of their fiduciary duties, Plaintiffs lost their claims;[43] that defendants' failure to act with due care resulted in Plaintiffs losing their

---

[37] *Id.* at 1260.

[38] *Bennett v. Litton*, 2011 U.S. Dist. LEXIS 166826 (W.D. of La. 6/9/2011).

[39] *Id.* citing *United States v. McGinnis*, 201 Fed. Appx. 246 (5th Cir. 9/28/2006).

[40] *See* Exhibit "5", pg. 3, ¶ 7(d).

[41] *Id.*, pg. 3, ¶ 7(e).

[42] *Id.* pg. 3, ¶ 7(f).

[43] *Id.*, pg. 14, ¶ 46.

subsistence claims;[44] and it is his opinion that the Defendants' various and overlapping breaches of contract, conduct, and/or care, were a proximate cause of damages to each and all of the Plaintiffs.[45]   Cooper's analysis focuses solely on whether plaintiffs' claims were filed successfully but fails to address any of the issues that may have arisen in regard to plaintiffs' subsistence claims had the claims been successfully filed.

Cooper's affidavit is defective because it fails to provide a basis for his broad conclusion that Defendants' alleged negligence was the proximate cause of plaintiffs' failure to receive a subsistence payment.   Cooper states in a negligence-based malpractice claim, clients must prove duty, breach, causation, and damages.   To establish causation, plaintiffs must satisfy the so-called "case-within-a-case" standard; in other words, plaintiffs must show that but for the attorney's negligence the client would have been successful in the prosecution of the underlying action.[46]   It is the opinion of Cooper that as a direct result of Defendants' alleged breaches of their fiduciary duties, Plaintiffs lost their claims.[47]   The issue is that Cooper's affidavit is silent on the issue of whether plaintiffs' subsistence claims would have been successful but for the alleged negligence of Defendants.

Cooper *assumes* that had plaintiffs' subsistence claims been filed successfully, each of the plaintiffs would have been eligible to receive a subsistence payment.   Cooper's opinion should be excluded because his opinion (or assumption) is without sufficient evidentiary support

---

[44] *Id.*, pg. 14, ¶ 53.

[45] *Id.,* pg. 14, ¶ 54.

[46] *See* Exhibit "5", pg. 14, ¶ 49.

[47] *See* Exhibit "5", pg. 14, ¶ 46.

or investigation.  If the expert's opinion is not sufficiently linked to factual data a court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.[48]   There is a huge analytical gap between Cooper's opinions and the facts of the instant case, so much that his opinions, in their entirety, should be excluded.  Cooper's affidavit fails to address whether each member of the plaintiff class would have fulfilled all of the requirements of the claims process that successfully filed claims had to endure.  Cooper's affidavit fails to address whether each member of the plaintiff class, for example, possessed the required hunting and fishing licenses to harvest the species alleged in their respective claim forms, since all of the proposed class representatives' claims allegedly exceeded $10,000 in amount and would have required "field visits, whether those claims  would have passed a "field visit", or whether any of the subsistence clients had received other recoveries from DHECC and executed a release agreement precluding any further recoveries.

The fact that Cooper's affidavit fails to address any of the underlying requirements subsistence claims would have to fulfill in order to receive a subsistence payment is evidence that Cooper's methodology, or lack thereof, is not only misleading but starkly unreliable.

If this Court were to accept Cooper's analysis, it would have to assume that 100% of the claims that were successfully filed received a subsistence payment which this Court is aware was not the case.  Such expert testimony based on an assumption is inadmissible. Explaining and applying *Daubert*, the United States Supreme Court and the United States Fifth Circuit Court of Appeal both instruct the *Daubert* requires that the expert witness' theories and opinions be based

---

[48] *General Electric Company v. Joiner*, 522 U.S. 136, 146 (1997).

on actual evidence from which the litigation at hand rises.[49]  Cooper's affidavit and the incorrect

assumptions made therein show that he failed to review each claim to determine, in fact, any of

the claims would have been successful but for the alleged negligence on behalf of the

Defendants.  The expert's testimony must be connected to the actual facts, not mere analogy or

assumption.[50]   Thus, Cooper's impermissible reliance on *ipse dixit*, provides grounds for

exclusion of his testimony and opinions.  Further, Cooper's testimony and opinions should be

excluded because his testimony would not assist the jury.

Cooper is attempting to draw a straight line from a successfully filed claim to a claim that

would successfully receive a subsistence payment and by attempting to do so is providing

misleading testimony that should be excluded pursuant to Rule 403 of the Federal Rules of

Evidence.[51]   Cooper concludes that Defendants breached their fiduciary duties, breached their

duty of care, or were negligent as a matter of law,[52] or otherwise impermissibly offers legal

interpretations of various facts relevant to this case. Statements encompassing these topics are

nothing but unadulterated legal opinions, with no possibility of aiding the jury in reaching an

appropriate verdict. Accordingly, any such testimony must be excluded.

---

[49] *Kumho Tire Company Limited v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 1179 (1999).

[50] *Washburn v. Merc & Company*, 213 F.3d 627 (2nd Cir. 2000) (expert testimony opining that rubella vaccination caused arthralgia, chronic arthropathy and chronic pain syndrome excluded for absence of actual causation.).

[51] *See* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.").

[52] *Id.*  ¶¶ 7, 51, 54.

## CONCLUSION

For the foregoing reasons, Defendants Howard, L. Nations, APC, The Nicks Law Firm, LLC, Rueb & Motta, APLC, Joseph A. Motta, The Rueb Law Firm, APLC, Howard L. Nations, Cindy L. Nations, Shantrell Nicks, Gregory D. Rueb, and Joseph A. Motta request that this Court issue an order: **(1)** excluding the affidavit of Plaintiffs' expert, Benjamin A. Cooper, Esq., (Doc 189-3), which was filed in connection with the Plaintiffs' Supplemental Memorandum in Support of Class Certification. (Doc. 189-2), **(2)** barring Plaintiffs from presenting any witness testimony which provides a legal opinion or conclusion, and **(3)** for such other relief that the Court deems appropriate under the premises.

**RESPECTFULLY SUBMITTED,**

*/s/ Judy L. Burnthorn*
JUDY L. BURNTHORN (TA)(#17496)
jburnthorn@deutschkerrigan.com
JOANNE P. RINARDO, (#24201)
jrinardo@deutschkerrigan.com
ZACHARY S. WESSLER (#38438)
zwessler@deutschkerrigan.com
**DEUTSCH KERRIGAN, L.L.P.**
755 Magazine Street
New Orleans, LA  70130
Telephone:  504 593 0688
Facsimile:  504 566 4088
**Attorneys for Defendants, Howard L. Nations, APC, Howard L. Nations, Cindy L. Nations, The Rueb Law Firm, APLC, and Rueb & Motta, APLC**

*/s/ Patrick S. McGoey*

_____

Kyle Schonekas (#11817)
Patrick S. McGoey (#24549)
Andrea V. Timpa (#29455)
SCHONEKAS, EVANS, MCGOEY &
MCEACHIN, L.L.C.
909 Poydras Street, Ste. 1600
New Orleans, Louisiana  70112
Telephone:  (504) 680-6050
Facsimile:  (504) 680-6051
kyle@semmlaw.com
patrick@semmlaw.com
andrea@semmlaw.com
**Attorneys for The Nicks Law Firm, LLC and
Shantrell Nicks**

*/s/ Brian Capitelli*

_____

Brian Capitelli (#27398)
Ralph Capitelli  (#03858)
Justine Geiger Daniel (#36856)
CAPITELLI & WICKER
1100 Poydras Street, Suite 2950
New Orleans, Louisiana 70163
rc@capitelliandwicker.com
brian@capitelliandwicker.com
jsg@capitelliandwicker.com
**Attorneys for Joseph A. Motta**

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 18, 2020 a copy of the foregoing pleading has been

electronically filed via the Court's CM/ECF system, which will send a copy of the foregoing to

all counsel of record by notice of electronic filing.

*/s/ Judy L. Burnthorn*
**JUDY L. BURNTHORN**

28